We will now move to the cases on the appellate calendar. So we'll begin with, it's a tandem case. We originally had been assigned one of these cases. We then granted the request to make these two cases heard together. That's Beierwaltes and Aboutaam, I'm not sure if I'm pronouncing those right, two plaintiffs against the same defendant, which is the Canton of Geneva, same counsel and same issues. We'll have 15 minutes per side for both cases, consolidating the arguments. So let me just make sure counsel is here for the appellants. Yes, your honor. Good morning. And you can just state your name for the record. Anju Uchima of Pearlstein and McCulloch. Okay, Mr. Uchima. You've got 15 minutes, but you've reserved three for rebuttal, so you'll get 12 out of the gate. And then for the appellees, for the Canton of Geneva, and then the office, I won't, I don't speak French. So the Federal Office of Culture, I think, is the English translation. Just let the counsel state their names. Good morning, your honors. Reeves Anderson of Arnold and Porter for the Canton of Geneva. Okay, Mr. Anderson, you've got eight minutes. Good morning. Good morning, your honor. Michael Jaffe, Pillsbury Winthrop, on behalf of the Federal Office of Culture and the Customs Administration, Federal Customs Administration. You've got seven. So we'll begin with Mr. Uchima, who's got 12 minutes out of the gate. Mr. Uchima, you may proceed. Good morning. May it please the court. We have two related appeals here, one by Hisham Abutam, and the other by Linda and William Byerwaltz. Together, the two actions involve nearly $100 million of antique art belonging to the appellants who are U.S. citizens that have been held in Switzerland over the past three and a half years, seized pursuant to a warrant lacking any probable cause as to the appellants, and under an investigation that, in the absence of probable cause, is ill-defined, assumes the guilt of appellants, and amounts to an indefinite detention of the property without compensation to appellants in violation of international law within the meaning of the takings exception to the Foreign Sovereign Immunities Act. In February 2017, the appellees seized approximately 12,000 objects of ancient art on premises controlled by Phoenix Ancient Art Gallery in Geneva. Swept up in the seizure were approximately 1,200 pieces belonging to Mr. Abutam, worth about $90 million, and 18 belonging to the Byerwaltz, approximately $8 million worth of property. The warrant of seizure was based on seven objects of suspicious provenance or origin and identified eight defendants suspected of crimes in connection with stolen goods and violations of the Cultural Property Transfer Act, which I'll label in shorthand the LTBC after the French words. None of the appellants is listed among the defendants, and there's no mention of any of them or any of their property in the warrant. Appellants thus had their property frozen despite the Swiss authorities not having set forth any reason to suspect any illegal activity on their part or with respect to any of their property. At the outset, it's important to- Are you saying it violates Swiss law or it violates US standards for a seizure of property? Or what are you saying? You're saying the Swiss authorities did act pursuant to a warrant, right? Your Honor, what we're dealing with is the takings exception to the Foreign Sovereign Immunities Act, which- International law. That's international law, which in turn would incorporate basic concepts of fairness and due process, I would add. Are you saying this is a violation of Swiss law too or no? We believe it's a violation of United States law and international law. But not- What United States law do you think- And Swiss law to the extent that the criminal procedure statutes would require the return of any property that is not going to be used in connection with the investigation. And we believe that that should have been, after three and a half years, determined by the Swiss authorities and returned to the- What United States law do you think is violated that would bring this within the takings exception? Yeah, what we believe the Swiss authorities have done with the appellant's property turns fundamental concepts of fairness and due process on their head. What they've done essentially is seized- And the reliance for the extraterritorial application of due process is what? Yes, according to the restatement of foreign relations law, section 712, which comments on the takings exception to the Foreign Sovereign Immunities Act, they explain that the line drawn in international law is most likely that of the 5th and 14th amendments under United States law. And so what we have here is a situation- International law incorporates the standards that the US courts have elaborated under the 5th and 14th amendments? Yes. Yes, that would be our position, Your Honor. If we find that a foreign government's conduct violates the 5th and 14th amendments, we should find that it ipso facto violates international law. Is that your position? Yes, as a taking in violation without compensation, without adequate compensation to the property owners. What we have here is a situation where they've seized property without specific suspicion- Joined the meeting. Criminal activity, and then it's held it while they hunt for some evidence of crimes. That means they're operating- I'm getting confused about that. Our own views on what controls the seizure of property in this country is the 4th amendment. And as you know, there is precedent instructing that the 4th amendment does not have extraterritorial application. What we've got here is a Swiss warrant issued. Whether or not it would satisfy a United States court's probable cause requirement, they have pointed to what their suspicion was. It's not nothing. And in that sense, I don't know how we view it as a taking, which the courts have generally viewed as nationalization. We don't have nationalization here. We don't, Your Honor, but it's nonetheless a taking. And the restatement is clear that when you have what might be termed, or at least initially, a temporary deprivation of property, as by a freezing of assets, that could become a taking if it is indefinite or prolonged a situation that we have here. So what is the line we draw to preclude every seizure happening abroad, not coming into the United States as a takings claim, as a claim under the FSIA under the takings exception? What is it that takes this case across any line that would preclude wholesale review of foreign seizures? Well, again, it's the indefinite detention of the property that's at issue, a property that's... How do we know that it's an indefinite detention? So it's now been about five years, and the time before the court made its decision, it was even less time. The Swiss are saying they're doing it to facilitate a criminal investigation. Is it up to us to decide that, well, they're not really doing a criminal investigation, they're just holding the property indefinitely? Why would we do that? In the absence of probable cause, as I alluded to earlier, the investigators simply don't appear to know what they're looking for. It's important to... You do have an opportunity for judicial review in Switzerland, as I understand it, on the fact that this has all taken so long. Have you availed yourself of that? Your Honor, let me answer that by referring to correspondence between our client and the Geneva prosecutor before they filed their action. In a letter to the prosecutor that outlined the reasons why our client's property fell outside the scope of the LTBC, the statute on which the seizure is based. In response to that, the prosecutor then demanded production of all title to each of their pieces of property, which is a standard that's effectively impossible to meet and that would require our clients to effectively prove their innocence. I'm not getting an answer to my question, which I assume is no. You have not gone into Swiss courts that are available to you to challenge the prosecutor's actions and the time that it has taken them to make decisions. I mean, that's what the record says to me, unless you're going to tell me I've misunderstood it. That's correct, Your Honor. We have not done that. And the reason is... All right. In that case, why should this court identify a takings before you have sought relief from the Swiss courts? Your Honor, two reasons. One is that we don't believe that relief would be effective in Switzerland because we have a situation where there's an inherent conflict of interest in appealing to a Swiss court as a foreign national to contest the actions of their state prosecutor. And I think that that's just an unreasonable demand on foreign claimant. The second is, I guess, the reason... You said a moment ago that you thought that this seizure was in violation of Swiss law. So you're telling us to conclude that the Swiss courts would not enforce Swiss law properly and therefore we need to step in. Is that what you're saying? Well, yes. I think that what we're arguing is that the court should step in to afford much needed relief to American nationals for the indefinite detention of almost $100 million of their property. The second, to the extent it's a question dealing with international comity and the requirement that a claimant exhaust local remedies in a foreign forum before bringing suit here, that very issue is up before the Supreme Court this term. I believe there's an argument in December. And these are two cases that are up from the DC Circuit. And it would be our position that as the DC Circuit found, the FSIA, the Foreign Sovereign Immunities Act, is a comprehensive regime that was intended to displace what had previously existed, which would have been a case-by-case determination by the executive of when to assume jurisdiction over a claim against a foreign country. Forget about exhaustion of remedies. What you're asking us to do is conclude that in order to intervene here, that the Swiss courts are incapable of enforcing Swiss law within their own borders. And therefore, what we should do is apply Fourth and Fifth Amendment standards to a taking that happened in Switzerland and invalidate it based on American law. Is that right? Yes, that's correct, Your Honor. We believe that that's the only effective remedy that our clients have in view both of what I referenced as the inherent conflict of interest that the Swiss courts would have in dealing with this. Now, if the Swiss courts were going to enforce Swiss law, but Swiss law fell short of Fourth and Fifth Amendment standards, would you still say we should intervene? Yes, Your Honor, because I think the taking's exception in the Foreign Sovereign Immunities Act is... But you're saying that whenever a seizure by the police in a foreign country falls short of Fourth and Fifth Amendment standards that we would apply domestically in the U.S. courts should intervene and invalidate those seizures? I think that's the effect of the taking's exception, Your Honor. Can I ask a question about this conflict? So you're suggesting then conversely that a Swiss national who had assets seized in the U.S. would not be able to get a fair shake in U.S. courts because federal prosecutors were on the other side of the and that a U.S. court would be conflicted anytime that the executive branch of the home country is involved. Is that your position? I believe there is a risk of that, Your Honor. As I've stated, it's a state arm of the Swiss system that has taken this property and has indefinitely taken control of it without any recourse. Well, you agree that it's your burden to show that you fit within the taking's exception, right? Yes, Your Honor. Now, with respect to the initial seizure, this court in Chetri has said that criticism over how law enforcement seized property in a foreign country is generally not enough to satisfy the arbitrary condition of takings that has to rise to the level of being irrational, which I don't think you can satisfy here. So then you get into the amount of time they've taken to act and what we know is that there's recourse in the Swiss courts, usually in the United States, in our concept of due process, for instance, when someone is challenging state action. If there's an opportunity to be heard in the state, that's part of the process and you haven't been denied due here. If I could address the Chetri point first, Your Honor. I think it's important to point out that what we have here is not what might be termed, it's a funny term, but guilty property, property that was used in connection with a crime or otherwise connected to a crime. That's a type of property that can be seized pursuant to a state's police power or with cause. That's a type of property you have in the main cases that are cited by the appellants, such as Chetri. You have the bank accounts in Chetri and Hilsenrath, which were unquestionably the piece of property that the government suspected of being involved in a crime. You have the shipment of goods with counterfeit trademarks and Acadia technology and you have the infamous motor vehicle in Venice. In those cases, there was no issue with respect to linking the seized property to a crime. That's what enabled the government to claim there's conducting a routine criminal investigation. Just a clarification, the Swiss here do have questions about the providence of these objects. They do think that there's a crime to which they might be connected. Are you saying they don't have enough cause to establish that or that that whole thing is a smokescreen and they don't really have questions about the providence of these property? There's not a shred of evidence or nothing, absolutely nothing in the warrants or anywhere else linking those pieces of property to any alleged crime. That's the fundamental distinction. Concern about fraudulent importation and that there is some question about seven objects of suspicious providence. The point on Chetri is that you have to show that the seizure was arbitrary. Here it's pursuant to a warrant and the warrant they say is supported by these facts that they've outlined that indicate to them that they have reason to question the providence. My understanding was that while it's taken a long time, they're trying to sort all this out and I don't see how you get past Chetri and until you see whether the Swiss courts will give you relief, I don't know how you claim that you've been denied due process by the length of time. Your Honor, none of those items that were referred to in the warrant are connected to any of the appellants. There's no suggestion that they are. There's absolutely no suspicion articulated by anybody with respect to our client's property. That's an issue. Actually, it doesn't matter how long they've held the property because regardless of the length of time, they didn't have probable cause in your view and so even if they were only holding it for a month, you would say that it's a taking. Well, that's correct. If we were here, we would certainly make a motion under federal rule of criminal procedure 41G or the CAFRA section for return of the property because of a lack of probable cause but I think what we have here is a lack of probable cause coupled with an indefinite investigation which because of the lack of probable cause with respect to my client's property is ill-defined and appears to simply assume the guilt of my clients and their property. They're treating it as guilty property even though there's no basis for them to do that and because of that, what they're doing is proceeding on a piece by piece basis of the thousands and thousands of pieces under investigation and trying to find some physical evidence of a looting or a connection to a country that's been known to have looting problems and they also seem to be recreating chains of title in an effort to find some an academic exercise really assuming the guilt of my clients. It's a guilt by association which I think is deeply unfair. All right, so we're well over but you've reserved three minutes for rebuttal. We'll now hear from Mr. Anderson. Good morning, your honors. May it please the court. The district court got it exactly right. The Foreign Sovereign Immunities Act as interpreted by this court protects foreign sovereigns from lawsuits exactly like this that are designed to interfere with an ongoing criminal investigation on foreign soil. This court can affirm on either of two clear-cut grounds. First, under this court's decision in Chetri, as you alluded to Judge Raji, plaintiffs do not allege a taking much less a taking in violation of international law. A criminal warrant that freezes assets abroad simply does not constitute expropriation. Second, and independently, the antiquities remain in Geneva and this court lacks jurisdiction. Can I just ask, your opposing counsel said a moment ago that international law incorporates fourth and fifth amendment standards for seizures. Is that accurate? I'm not aware of any court that is so held. International law was chosen precisely by Congress to reflect international standards. You can find those in the restatement that was the restatement of foreign relations law that was in effect at the time. A violation of international law in the takings context is one of three things. Property taken not for a public purpose, a discriminatory taking based on nationality, or where there is a taking that requires compensation, no just compensation was given. Nowhere was there reference to the fourth or fifth amendment to the U.S. Constitution in defining international law in the statute. As I was saying, the second basis this court can affirm is the fact that the property remains in Geneva and it's undisputed that the property is not present in the United States as the statute requires. So the statute starts from the presumption of immunity and it's plaintiff's burden to show an exception. Here there simply is no taking. Not every governmental interference with property rights constitutes a taking. That's a legal term of art. Taking is generally understood. It's already been five years since the items were seized, right? And they still haven't determined if there's a problematic provenance. So if it took another five years, would we then say it starts to be arbitrary? So your honor, just as a factual clarification, it's been three and a half years since the seizure. This lawsuit was filed in a year and a half. And certainly in Chetri it had been eight years. The court found that that was not indefinite and plaintiffs concede in their reply brief that Chetri did not involve an indefinite detention. But to your honor's point, how long is too long? I think it depends on the based on a contingency. The Supreme Court clarified in 2017 that to exercise jurisdiction under the takings clause, plaintiff must establish now a valid taking in violation of international law. Sorry, a valid claim of a taking in violation of international law. What may arise 15 years from now is not the basis for jurisdiction today. What are the avenues available to the plaintiffs in Switzerland to challenge either the original taking or the length of time the property's been held? Yes, your honor. As the plaintiffs were notified both in the warrant itself, as well as in the communications with the GIVA prosecutor, there are avenues for judicial review in Switzerland. Specifically, one of the letters references article 393 of the Swiss criminal code that allows the plaintiffs or anyone aggrieved by the property deprivation to challenge the legal basis for the seizure, to challenge the prosecutor's exercise of discretion in this case, and also, and this is important, to challenge an unjustified delay in the investigation. If this sounds familiar, it's because it sounds a lot like rule 41g of criminal procedure in this country. Criminal rule 41g says that a person who is aggrieved by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The absolute same rules should apply here as a matter of reciprocity and respect for the Swiss tribunals. Plaintiffs were aware of their opportunity to avail themselves of that judicial exception to immunity needs to fill some gap. The second point, in addition to the fact that there is no taking under law, is that there's no violation of international law. The questions to plaintiffs' counsel highlighted the fact that the challenge here is fundamentally a challenge to Swiss law and Swiss procedure, not international law. As I said before, the violation of international law is limited to if something was not taken for a public purpose, or if it was discriminatory, or there was no just compensation. Finally, the third point is that there is no nexus to the United States as the statute requires. The text of the Foreign Sovereign Immunities Act expropriation exception sets up, bless you, Your Honor, sets up two distinct tests depending on the identity of the sovereign. I want to go back to international law for a second. I mean, your opposing counsel was just saying that because they are Americans, they're not getting a fair shake from the Swiss courts, and so therefore their property is being indefinitely detained. I mean, is that enough to say that there is discrimination on the basis of nationality? No, Your Honor, absolutely not. What discrimination on the basis of nationality means under international law is that the property was seized because it belonged to a non-national. It's essentially a discrimination provision to make sure that countries don't simply seize the assets of foreigners and nationalize them for their own purpose. The fact that they feel that they may not get a fair shake, and again, that's complete speculation because they've not tried, is not the basis for a discriminatory taking. Here, the plaintiffs cast the property as innocent, but it's anything but. As the warrant lays out, that although the plaintiffs may not be named as a defendant in the warrants, that their property was stored with Phoenix Ancient Art in a warehouse in Geneva. Phoenix Ancient Art is named as a defendant, as is Ali Abu Tam. Their property was consigned to the some time is due in part to the plaintiff's intransigence. You know, they have refused to cooperate with the prosecutor here and allow a more expeditious review of. Now, again, this is a very complicated investigation involving, at one point, 12,000 artifacts. 5,000 of those have already been returned, and it requires the retention of cultural property law violations or customs violations. And they seized 12,000 artifacts based on evidence of one fortunately imported object, right? That's a question of whether there's probable cause, in a sense, to support the warrant, and that's a determination that needs to be made by a Swiss court. It was made by the prosecutor here, and there's no allegation that there wasn't a valid basis to suspect some suspicions with respect to some of those objects. Mr. Anderson, when is it too long? I guess that's really the question. I mean, so even if there was probable cause, if you hang on to something for 10 years, isn't that effectively a taking? I mean, you can't just go through these items one at a time, once a week, right? Your Honor, for the Fifth Amendment analogy again, the Federal Circuit held in, I believe, the Acadia Tech case that six years was not too long. This court in Chetri found that eight years was not too long. Today, we are at three and a half years, and so this question, sorry, plaintiff's argument just may not be right. But you are right that there may become a point in time where an indefinite detention becomes a nationalization de facto. That is not the case here. Property is still being returned either to the plaintiffs or to other property rights owner as we speak, and this investigation is ongoing. And so there may be a time when it ripens, but it has not yet occurred. And more fundamentally, and I recognize I'm out of time, Your Honor, more fundamentally, the question has to do with the circumstances of the seizure itself. This is an incredibly complicated investigation. The Geneva prosecutor has hired experts to assist him. The plaintiffs have refused to cooperate, which could have expedited this. So to find an indefinite detention after this short period of time under the circumstances of this case would be unprecedented, Your Honor. All right. Thank you, Mr. Anderson. We'll now hear from Mr. Jaffee. I think I need to be unmuted. Good morning, Your Honors, and may it please the court. I represent the two departments of the Swiss central government. And first we join in the arguments that have been made on behalf of Geneva indicating that a U.S. court ought not to intercede in the affairs in Switzerland of a Swiss criminal investigation, especially in the circumstances, as Mr. Anderson indicated, there are opportunities in Switzerland for the appellants in this case to air their grievances. But I come at the discussion this morning from a little bit of a different perspective, because as I think Mr. Anderson indicated, the Foreign Sovereign Immunities Act under the taking clause differentiates between the foreign sovereign itself and agencies and instrumentalities of the foreign sovereign. With respect to the foreign sovereign, the statute is plain. If the property is not in the United States, there is no jurisdiction under the FSIA against the foreign sovereign under the takings clause. And so what we have here is an argument by the appellants that both the Office of Culture and the Customs Administration are rather agencies or Swiss central government. The term agency or instrumentality is defined in section 1603B. And there are three conjunctive requirements that have to be met before an entity can be found to be an agency or instrumentality. The first is it must be a separate legal person, corporate or otherwise. It has to be either majority owned by the foreign state or an organ of the state. And lastly, the property at issue has to be either owned or operated by that agency or instrumentality. The record in the trial court was unmistakable. Mr. Hans Nussbaum, a Swiss government lawyer, provided a declaration. In his declaration, he is unequivocal. Neither customs nor culture has any independent legal existence. They are part, integral parts of the Swiss federal government. And in fact, Switzerland in responding to the World Trade Organization, where it had to list entities that are part of the central government and those that are outside the central government, listed both culture and customs as part of the central government. Mr. Nussbaum's affidavit was not challenged in any regard before Judge Abrams. There is no evidence in the record that either customs or culture was anything but a part of the central government. What the appellants do is they skip over that first prong. And as I indicated, the statute reads in the conjunctive, not the disjunctive. And they skip over the first one and say, well, we should look at the core function because we can now find that these organizations, in particular, the culture, Office of Culture, is engaged in commercial activities in the United States. And therefore, it is an agency and not a part of the central government. And what is the evidence to which they refer? It's that the Office of Culture and things of that nature. Well, I dare say, if you look at the Departments of Defense, as we did in the record before Judge Abrams, the Department of Defense publishes books, sells thousands of books on the internet, many of them dealing with cultural aspects of life on the United States. The same could be said for the Department of Commerce. The same could be said for the Department of State. The fact that they're engaged in those kinds of activities, that they have budgets, that they engage in commercial activity of one kind or another, by no stretch of the imagination, robs them of their fundamental governmental purpose. And the same is true here. Let me turn to the third prong of the conjunctive requirements, that the agency or instrumentality has to own or operate the property. And the question is, how do we get there? And it gets back to what Mr. Anderson was saying before, that you can't have a predicate for jurisdiction based on a contingency of something that may happen in the future. And that's exactly the basis upon which the appellants predicate the argument that culture owns or operates the property. And what they say is, if the property is ultimately seized, as opposed to being temporarily restrained, and it's to be repatriated, then the Office of Culture will become involved in that repatriation. And therefore, the Office of Culture is now in possession, owns or operates the property. I think that that is a far stretch, and as Mr. Anderson indicated, a contingency that cannot be a predicate for jurisdiction. Lastly, let me touch on the discovery issue. Appellants did ask Judge Abrams for discovery. But what do they say in their reply brief? They say, to the extent factual issues exist with respect to whether the Office of Culture is a separate legal person from Switzerland, performs a commercial core function, is an organ of Switzerland, owns or operates property, the seized property or engages in commercial activity, discovery is appropriate. With all due respect, that is hardly an indictment of the district court's decision. It certainly is not showing that the district court engaged in an arbitrary decision making process. In fact, when Judge Abrams asked counsel for appellants, what discovery do you want? They were quite indefinite about what they wanted and ultimately said, maybe we don't need discovery at all. In our briefs, we argue... If we agree, I guess, with Mr. Anderson, that the law enforcement seizure doesn't apply, there was no taking in violation of international law, that ends it, right? We don't even need to get to these points, correct? That's correct. Okay. I assume that my time is up. Can I have one concluding sentence? Yes, certainly. We note that in our briefs, we also address the act of state doctrine in international comedy. Obviously, the court does not have to reach those decisions if the court affirms either on the basis of Mr. Anderson's remarks or on my earlier remarks. Those doctrines do further... If we were to find jurisdiction under the expropriations exception, wouldn't we have already found that there was a violation of international law, and so therefore, wouldn't the act of state doctrine not apply? Your Honor, I beg your pardon. I had difficulty hearing the first part of what you said. I apologize. Maybe I'm having trouble with my microphone. I was saying, if we were to find that we had jurisdiction because the expropriations exception applied, wouldn't we necessarily have found that there was a violation of international law, and wouldn't that also prevent us from applying the act of state doctrine? Yes, Your Honor. It would. It would. Right. So the act of state doctrine is not an alternative argument from the expropriations exception. If we found that that applied, there'd be a violation of international law, we couldn't apply the act of state doctrine. Correct, Your Honor. Okay. For the reasons that have been discussed, we respectfully ask the court to affirm Judge Abrams' decision dismissing both lawsuits. All right. Thank you, Mr. Gaffney. We'll now hear from Ms. Gutierrez for three minutes, everybody. Counsel, I'm not hearing you. Unmute. Okay. I'm unmuted now. I'd like to just address a few of the points raised by opposing counsel. One was in response to the question of how long is too long with respect to detentions of property, and Mr. Anderson referenced eight years in Chetri, but I think that's a little misleading because in Chetri, you did have probable cause, and it was the existence of probable cause that we believe enabled the authorities in that case to bring formal charges against the plaintiff in two and a half years. Here, by contrast, we have three and a half years with really no end in sight, and there have been no charges, no findings of illegality as far as we know of any kind, and so the eight years that he's referring to is eight years of criminal proceedings after the formal charges were brought, which is a completely different situation. Second, with respect to the availability of a Swiss forum, as I alluded to earlier, there was an attempt on the part of the Geneva prosecutor to reverse the burden of proof on our clients, something that I believe, first of all, would not happen in the United States, and second of all- Wait, wait. If a prosecutor said that, if a prosecutor sees things and then said, I'm not giving it back to you until you can prove to me that you're innocent, then a person could go into a US court, right? Correct, but we're still concerned about the- Presumably one can go into a Geneva court or a Swiss court when that's the situation in Switzerland. Well, we were very concerned about the deference that would be accorded to the Swiss prosecutor under the circumstances because he was acting pursuant to a state statute that allowed this type of seizure and this type of detention. What statute allows them to put the burden of proving innocence on your client? No, we don't think there is a statute. In fact, it's the opposite. The same extent you would argue that the prosecutor is acting in violation of law in the United States, you could argue that in Switzerland, you have made no attempt to do so. That's what troubles me. Why shouldn't it trouble me? Well, because we were concerned about subjecting our client to criminal jurisdiction in Switzerland where there were no charges of any kind against him, and he had had an experience where his sister in law had been thrown in jail some months previous by the same prosecutor. Well, let me ask you this. If the reason you do not take advantage of the Swiss courts is because you don't want to subject your client to jurisdiction there, I'm not sure how that demonstrates the arbitrariness of the Swiss actions. That's a strategic choice you've made. It doesn't necessarily demonstrate that their actions are arbitrary in this taking, which is what you need to do to bring yourself within the exception. What am I missing? I believe it's still an arbitrary action, which we were unable to pursue in the Swiss court out of concern for the safety of our client. So now the United States court decide that under Swiss law, that action by the prosecutor is arbitrary? Yes, Your Honor. We believe that was the case. It was an arbitrary reversal. But what would be the basis for a US court deciding that rather than a Swiss court, which you don't want to go to because your client doesn't want to subject itself to jurisdiction there? It's the arbitrariness of the act, which was done under color- But that's just your argument. That's not been established. You'd either have to establish it to the Swiss court or to the US court. I mean, you're just saying it's arbitrary. They're saying it's not arbitrary. So you need an adjudicator to make the decision and you don't want it to be the Swiss court. That's correct, Your Honor. This is an American court. These are American plaintiffs with a heck of a lot of money seized abroad. And this is the forum that works for the plaintiffs. Your Honor, I had a couple of other points, but I see my time is up. We have the briefing. In fact, two sets of briefing. So we'll reserve decision. Thank you all. Thank you very much. Thank you.